The **KROGER COMPANY,**
Appellee–Plaintiff,

v.

George Robert **TOLLETT, Commissioner of Revenue of the State of Tennessee,**
Appellant–Defendant.

Supreme Court of Tennessee.

Dec. 1, 1980.

George H. Masterson, Jay S. Bowen, James C. Gooch, Bass, Berry & Sims, Nashville, for appellee–plaintiff.

Jim G. Creecy, Deputy Atty. Gen., Nashville, for appellant–defendant; William M. Leech, Jr., Atty. Gen., Nashville, of counsel.

## OPINION

HARBISON, Justice.

This case involves the interpretation and application of a state privilege tax contained in T.C.A. § 67–4102 Item B, entitled:

"Bottlers and manufacturers of soft drinks and substitutes therefor."

The words "and substitutes therefor" were added to the title of the code section in the revision of the statute contained in 1963 Tennessee Public Acts, chapter 35. They are, in our opinion, of significance in ascertaining the legislative intent.

The taxpayer in this case, The Kroger Company, is neither a bottler nor a manufacturer of soft drinks but is one of the "substitutes therefor" referred to in the caption. The statute imposed a gross receipts privilege tax not only upon persons manufacturing or producing bottled soft drinks for sale within this state, but also:

"... any distributor, wholesale dealer or retail dealer or any other person who is the original consignee of any bottled soft drink manufactured or produced elsewhere, or who imports or causes to be imported into this state such drinks for sale in this state, except as hereinafter provided . . . ."

During the tax years in question, any taxpayer covered by the statute was required to pay a percentage "of his gross receipts derived from such business."

The interpretation of this measure of the tax is the principal question in this litigation. The Kroger Company, operating a network of retail grocery stores in Tennessee and a number of other states, purchases soft drinks for sale both from domestic bottlers and manufacturers in Tennessee and from such businesses operated in other states. Domestic bottlers and manufacturers, of course, pay a tax measured· by a percentage of their gross receipts from the sale of their products. The Kroger Company, a "dealer" for purposes of the statute, reported and paid the privilege tax based upon the amounts which it paid out–of–state bottlers–that is, Kroger's cost price, which, it insists, represented the gross receipts to out–of–state bottlers or manufacturers. It is the insistence of the Commissioner that Kroger should be required to pay a percentage of its own gross receipts from retail sales, rather than its costs paid to out–of–state bottlers. Since the parties were unable to resolve the dispute, ultimately The Kroger Company was assessed a deficiency and this litigation resulted.

Other provisions of the statute, as it existed at all material times,[1] were as follows:

"Provided, however, that out–of–state bottlers and manufacturers of such soft drinks or any other out–of–state person distributing such soft drinks in this state shall have the privilege of paying said tax in the same manner as local bottlers and manufacturers of soft drinks. Provided, further, that the original consignee or other person importing or causing to be imported into this state soft drinks shall not be required to pay the tax levied herein when the out–of–state supplier of such soft drinks makes proper certification to him that the tax herein imposed has been paid by such supplier. Any person importing or causing to be imported into this state, or selling or offering to sell such soft drinks, when the out–of–state supplier thereof has not paid the tax herein provided or has failed to make such certification, shall be liable for the full amount of said tax."

It is our opinion, based upon the language of this statute, that the interpretation insisted upon by the taxpayer is correct. It seems apparent to us that the General Assembly intended to exact from importers or dealers the same tax which would have been paid by out–of–state bottlers or manufacturers if those businesses had been subject to the state's taxing power. If they voluntarily paid the tax, then the dealer or distributor was not liable therefor, but in the event they did not pay the tax, the tax was imposed upon the dealer or distributor selling the products within the state. In either case, the tax would seem to be measured by the gross receipts of the out–of–state bottler or manufacturer who was given the privilege of paying "in the same manner as local bottlers and manufacturers." We do not read into the statute an intent that the in–state distributor should pay a tax measured by his own gross receipts, based upon his selling price, as distinguished from the amount received by the out–of–state bottler. Again, the tax is a privilege tax upon local bottlers or manufacturers of soft drinks "and substitutes therefor," it plainly appearing that the "substitutes" should stand in place and stead of the out–of–state enterprise which would have been taxed in the same manner as a local one, had it been subject to the taxing authority of the state.

As pointed out both by the Chancellor and the appellee, a contrary interpretation, imposing a greater tax upon the importation of products from out of state, could encounter serious constitutional difficulties and might render the entire taxation of dealers and importers invalid as an improper burden upon interstate commerce.[2]

A close examination of the history of Item B, T.C.A. § 67–4102, in our opinion, confirms the foregoing interpretation of legislative intent.

1. In 1978 the form and language of the statute were revised, but the parties do not insist that there was any material change in the meaning and effect of the statute.

2. Cf. *Boston Stock Exchange v. State Tax Commission*, 429 U.S. 318, 97 S.Ct. 599, 50 L.Ed.2d 514 (1977) (discrimination in taxation of out–of–state stock transfers held invalid.)

The privilege tax was first levied in 1937 only upon local bottlers and manufacturers. 1937 Tenn.Pub.Acts, ch. 108. It was in the form of a gross receipts tax. In 1941 the taxpayer was allowed credit in the amount of this privilege tax against any obligation which he might have under the corporate franchise and excise tax statutes. 1941 Tenn.Pub.Acts, ch. 51. In 1947, for the first time, out–of–state bottlers and manufacturers were taxed. 1947 Tenn.Pub.Acts, ch. 170.

The statute was amended from time to time and in 1955 was substantially rewritten. It was changed from a gross receipts tax to a tax based upon the number of cases of beverages sold in Tennessee, according to a fixed schedule. 1955 Tenn.Pub.Acts, ch. 309. That statute contained the following provision:

> "Out of state bottlers and manufacturers of such beverages in this State shall, for the privilege of doing business in this State, pay said tax in the same manner as local bottlers and manufacturers of such beverages."

In that same statute, the credit against franchise and excise taxes was deleted.

In 1957 the provision concerning out–of–state enterprises was revised. 1957 Tenn. Pub.Acts, ch. 385. The previous provision, taxing out–of–state businesses in the same manner as local enterprises, was retained, but a sentence was added levying the full amount of tax upon any person, firm or corporation importing the beverages into this state for sale "when the bottler or manufacturer thereof has not paid the tax herein provided . . . ."

Of course, so long as the tax was based upon the number of cases of beverages sold, no difference in the measure of the tax could exist, whether the taxpayer was local, out–of–state or an importer.

In 1963 the statute was completely rewritten, and its base was changed from the number of cases sold to a gross receipts tax. It was at that time, as previously mentioned, that "substitutes" for bottlers and manufacturers were included in the caption of the code section.[3] The public act itself provided for a revised title to the section and included most of the basic provisions which have remained in the statute until the present time, including those previously quoted in this opinion. 1963 Tenn.Pub.Acts, ch. 35. In 1972 the credit against franchise and excise taxes was restored. 1972 Tenn. Pub.Acts, ch. 476.

We are unable to ascertain either from the language used in the statute or from the legislative history any intention on the part of the legislature to discriminate against dealers or importers, or to impose upon them a greater tax than that imposed either upon domestic bottlers and manufacturers or upon out–of–state enterprises of that kind which may voluntarily pay the tax. Accordingly, wholly apart from any constitutional infirmities in the taxing scheme which might result from a contrary interpretation, we are of the opinion that the construction placed upon the statute by the Chancellor was correct, and his judgment is affirmed.

■ We find the same situation with respect to the credit against franchise and excise taxes. Appellant insists that under the literal wording of the statute, only an actual bottler or manufacturer is afforded the credit, and that it is not available to a dealer or importer. The dealer or importer, however, is required to pay the privilege tax imposed upon bottlers and manufacturers and is taxed in their place and stead, as a "substitute." We find nothing in the statute which indicates that the credit

3. The Commissioner contends that the words "and substitutes therefor" refer to products, not to the identity of taxpayers. We find nothing in the legislative history so indicating. The 1963 statute contained detailed definitions of "bottled soft drinks" and "non–alcoholic beverages." Nothing therein purported to deal with "substitute" beverages. On the other hand, the statute required dealers and importers to pay the tax in lieu of its payment by out–of–state bottlers and manufacturers. Appellee, correctly in our opinion, analogizes the tax on importers to the compensating use tax where sales occur elsewhere and personal property is later used within the state. T.C.A. § 67–3005.

should not be available to all corporations which are required to pay this particular privilege tax.

■ The final insistence of appellant in this case is that the taxpayer is entitled to recover only the sums of money specifically paid by it under protest, rather than the entire amounts claimed. The discrepancy resulted from a practice of the Commissioner, however, not of the taxpayer. When the initial deficiency in this case was assessed, the Commissioner credited the taxpayer's account with an amount to which the Commissioner conceded the taxpayer was entitled as a refund, resulting from the inadvertent payment of taxes on some non-taxable items. Instead of refunding these amounts to the taxpayer, however, the Commissioner applied them to the claimed deficiency and actually assessed the taxpayer only for the remainder. In effect, the Commissioner, ex parte and without consent of the taxpayer, appropriated the taxpayer's funds and applied them against the total deficiency. The taxpayer denied its liability for any of the additional taxes, interest or penalty claimed by the Commissioner, paid under protest the amount of the deficiency, and sued to recover both that amount and the sum which the Commissioner had appropriated. Under the circumstances, we are of the opinion that the taxpayer was entitled to proceed in that manner and that there is no merit in the insistence of the Commissioner that the taxpayer be limited to a recovery of the amount which it paid under protest. The Commissioner was holding the additional amount without the taxpayer's consent or authority, insofar as we are able to ascertain from the record. In the suit which was filed the taxpayer claimed the entire amount, and this was allowed by the Chancellor. The suit was filed within six months after payment under protest of the deficiency as calculated and assessed by the Commissioner.

The judgment of the chancery court is affirmed at the cost of appellant. The cause is remanded to the trial court for enforcement of the judgment and for any other orders which may be necessary.

BROCK, C. J., and FONES, COOPER and DROWOTA, JJ., concur.