IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
August 24, 2011 Session

# DR. PEPPER PEPSI-COLA BOTTLING COMPANY OF DYERSBURG, LLC v. REAGAN FARR, COMMISSIONER OF TENNESSEE DEPARTMENT OF REVENUE

Direct Appeal from the Chancery Court for Dyer County
No. 08-CV-592      Tony Childress, Chancellor

No. W2010-02445-COA-R3-CV - Filed November 16, 2011

An in-state bottled soft drink manufacturer argues, pursuant to the bottler's tax statute, that the in-state distributor to which it sells may pay the bottler's tax on such sales and utilize its own franchise and excise tax credit. Absent this flexibility, the manufacturer contends, equal protection guarantees are offended. The trial court granted summary judgment to the Department of Revenue, finding that the manufacturer bore the tax burden and that it could not utilize the distributor's credit. We affirm.

Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and HOLLY KIRBY, J., joined.

Matthew P. Cavitch, Memphis, Tennessee, for the appellant, Dr. Pepper Pepsi-Cola Bottling Company of Dyersburg, LLC

Robert E. Cooper, Jr., Attorney General and Reporter; Joseph F. Whalen, Associate Solicitor General, Gregory O. Nies, Assistant Attorney General, Nashville, Tennessee, for the appellee, Commissioner of Revenue

## OPINION

### I. FACTS & PROCEDURAL HISTORY

During the audit period of July 1, 2004 to June 30, 2008, Dr. Pepper Pepsi-Cola Bottling Company of Dyersburg, LLC[1] ("Dr. Pepper") acted as a "bottling company"–it "(1) manufactured soft drinks by mixing carbonated water with various syrups, (2) filled bottles and cans with the finished beverage, and (3) sold cases of bottled and canned soft drinks to distributors[.]" During this same period, Burks Beverage, LP ("Burks") operated as a "beverage distributor." Burks "(1) purchased cases of bottled and canned soft drinks . . . from manufacturers and distributors . . . and (2) sold bottled and canned soft drinks to dealers in [its] franchise territory."

Dr. Pepper and Burks are separate legal entities; however, both are housed under one roof, with a common ownership,[2] common office staff and common management staff. In fact, Dr. Pepper sold approximately 75% of its output to Burks, and Burks purchased approximately 85% of its inventory from Dr. Pepper. In an apparent attempt to take advantage of Burks' greater franchise and excise ("F&E") tax credits,[3] Dr. Pepper reported "the major portion" of its sales on Burks' bottler's tax returns.

In 2007, the Tennessee Department of Revenue ("the Department") conducted audits of the activities of Dr. Pepper and Burks. Following the audits, the Department ultimately issued a $155,804.10 assessment against Dr. Pepper, reflecting $104,585.34 in tax liability and $51,218.76 in interest. In contrast, it found that Burks had overpaid its bottler's tax by $124,587.59.[4]

To challenge the assessment, Dr. Pepper requested an informal taxpayer conference.

---

[1]Dr. Pepper was converted from a corporation into a limited liability company on October 19, 2007.

[2]During the audit period, Dr. Pepper had 1,335 shares of outstanding stock and Burks had 1,336 partnership units outstanding. All shares and units were owned by the same person, W. Eddie Burks, with the exception of the one additional unit.

[3]According to the Tennessee Department of Revenue's audit, "[a] certain portion of the Franchise and Excise Taxes paid by the same legal entity may be claimed against the [bottler's] tax calculated on the sales of [] soft drinks." "Because Burks Beverage pays much larger amounts of Tennessee Franchise & Excise Taxes than are paid by Dr. Pepper . . . , Burks Beverage's (F&E) credits available to be used against the Bottlers Tax are much larger than the credits available to Dr. Pepper[.]"

[4]The Department ultimately credited Dr. Pepper for the taxes paid by Burks, but it would not allow Dr. Pepper to use Burks' F&E credit.

Dr. Pepper contended that because Tennessee Code Annotated section 67-4-402, the "bottler's tax statute," allows out-of-state suppliers and in-state sellers to allocate between themselves the payment of the bottler's tax, *in-state* suppliers and in-state sellers should also be permitted to make such allocation. Specifically, Dr. Pepper argued that Burks should be allowed to pay the bottler's tax on Dr. Pepper's sales to it. The hearing officer upheld the assessment and affirmed the Department's interpretation of the bottler's tax statute as prohibiting Burks from paying the tax on sales of soft drinks manufactured or produced and sold by Dr. Pepper in Tennessee.

On June 23, 2008, Dr. Pepper filed a complaint in the Dyer County Chancery Court, alleging six counts against the Department. Both parties filed motions for summary judgment. The trial court entered an order on May 17, 2010, granting the Department's motion for summary judgment,[5] finding that "an instate manufacturer or producer of bottled soft drinks bears the tax burden imposed by the Bottler Tax when the instate manufacturer or producer of bottled soft drinks sells bottled soft drinks within this state to an instate person." Additionally, it found no equal protection violation, that Burks was not a "producer" such that it could pay the bottler's tax on soft drinks purchased from Dr. Pepper, and that the plain language of the statute did not permit Dr. Pepper to utilize Burks' F&E credit. Dr. Pepper timely appealed.[6]

---

[5]In its motion for summary judgment, Dr. Pepper requested that it be granted summary judgment regarding the first five counts raised in its amended complaint. The Department's motion also requested summary judgment on Dr. Pepper's first five counts as well as on its counterclaim. Both parties conceded at the hearing that Dr. Pepper's sixth count–estoppel–could potentially serve as a defense to the Department's counterclaim. Because consideration of the estoppel issue would require the court to make factual determinations, the Department's counterclaim was not considered at the summary judgment hearing. Subsequently, a consent order withdrawing the estoppel claim was entered, and the order granting summary judgment made final pursuant to Tennessee Rule of Civil Procedure 54.02.

[6] Burks is not a party to this case and neither Dr. Pepper nor the Department argues that it is a necessary party. It is important to note that it is Dr. Pepper's position that Burks and Dr. Pepper should be "permitted to allocate the tax burden." Dr. Pepper seeks the *option* of allocating the tax burden, but not a ruling *requiring* Burks to pay. Burks would still have to agree to the allocation. Therefore, Burks would suffer no adverse effect in this case and thus is not a necessary party to the action.

## II. ISSUES PRESENTED

Dr. Pepper presents the following issues, as summarized, for review:

1.     Whether the bottler's tax allows an in-state manufacturer and in-state distributor to allocate the bottler's tax liability between them;

2.     Whether an in-state distributor of bottled soft drinks may be classified as a "producer" under the bottler's tax;

3.     Whether the bottler's tax violates the Equal Protection Clauses of the United States and Tennessee Constitutions; and

4.     Whether the bottler's tax statute allows a manufacturer to use a distributor's franchise and excise tax credit.

For the following reasons, we affirm the decision of the chancery court.


## III. STANDARD OF REVIEW

The facts in this case are undisputed, and only questions of law are involved. Thus, our review is *de novo* upon the record with no presumption of correctness. ***Union Carbide Corp. v. Huddleston****,* 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.,* 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

## IV. DISCUSSION

### A. *Allocation of Bottler's Tax Between Out-of-State Manufacturer and In-State Distributor*

Tennessee Code Annotated section 67-4-402 et seq., "the bottler's tax," provides in relevant part, as follows:

> (b) Imposition of Tax. A person manufacturing or producing and selling within this state any bottled soft drinks and a person importing or causing to be imported bottled soft drinks into this state from outside the state and selling such imported bottled soft drinks within this state shall, for the privilege of engaging in such business, pay to the state for state purposes an amount equal to one and nine-tenths percent (1.9%) of the person's gross receipts derived

from such business.

. . . .

(2) A person located outside this state who distributes bottled soft drinks in this state shall, for the privilege of engaging in such business, pay the tax on gross receipts derived from bottled soft drinks distributed by the person in this state in the same manner as does a person located in this state.

(3) A person importing or causing to be imported bottled soft drinks into this state from outside the state and selling such imported soft drinks within this state is not required to pay the tax, if the person's out-of-state supplier of bottled soft drinks has paid the tax as stated in subdivision (b)(2).

The Department contends that the statute imposes the bottler's tax upon the four types of bottled soft drink sales: 1) when an in-state manufacturer sells within the state, the in-state manufacturer is liable for the tax; 2) when an out-of-state manufacturer sells to an in-state importer, who then re-sells the product, the in-state importer is liable for the tax; 3) when an out-of-state distributor directly distributes and sells within the state, the out-of-state distributor is liable for the tax; and 4) when an out-of-state distributor directly distributes and sells within the state, but also supplies an in-state importer, the in-state importer is not required to pay the tax if the out-of-state distributor has paid it.[7]

Dr. Pepper argues that "the statutory language is not as tight as the Department suggests"; however, the parties do agree that the statute permits an allocation of the tax burden between an out-of-state manufacturer and an in-state importer. That is, when an out-of-state manufacturer sells to an in-state importer, the in-state importer is relieved of the duty to pay the bottler's tax when it is paid by the out-of-state manufacturer. Dr. Pepper suggests that because such an allocation is permissible between an *out-of-state* manufacturer and an in-state importer, an *in-state* manufacturer and in-state importer should likewise be permitted to allocate the tax burden.

---

[7]The Department states that "[t]his fourth and last situation presents the only circumstance in which the bottlers tax statute implicitly allows for what may be termed an 'allocation' of the bottlers tax."

Dr. Pepper contends that the statute "read as a whole" permits in-state distributor Burks to pay the bottler's tax when it imports from in-state manufacturer Dr. Pepper. Dr. Pepper maintains that because such flexibility is afforded in transactions between out-of-state manufacturers and in-state distributors and because "it is undeniable that the Tennessee legislature did not intend to favor foreign business over local business[,]" we should read into the statute a similar accommodation for in-state manufacturers. Additionally, Dr. Pepper states that such an interpretation would not thwart the alleged statutory purpose of collecting at least 1.9% of the soft drink industry's gross receipts, as it claims "Dr. Pepper and Burks Beverage pay significantly more than their fair share of Tennessee taxes."

The issue of whether the bottler's tax statute permits an in-state manufacturer and in-state distributor to select which entity will remit payment has not been addressed by the courts of this state. However, previous cases discussing the bottler's tax offer some guidance with respect to the issue at hand.

In *Kroger Co. v. Tollett*, 608 S.W.2d 846, 849 (Tenn. 1980), in-state distributor Kroger paid the bottler's tax on soft drinks it imported from a foreign manufacturer and then resold. *See Beaman Bottling Co. v. Huddleston*, No. 01-A-01-9512-CH00567, 1996 WL 417100, at *3 (Tenn. Ct. App. July 26, 1996). The Commissioner of Revenue insisted that Kroger's tax liability should be determined based upon its own gross receipts from retail sales, rather than its costs paid to out-of-state bottlers. *Kroger*, 608 S.W.2d at 848. The Court held that the tax owed should be determined based upon the manufacturer's gross receipts–the amount Kroger had paid to the manufacturer. *Id.*

As relevant to the case before us, the Court examined the history of the bottler's tax,[8] noting that when the tax was first levied in 1937, it taxed only in-state bottlers and manufacturers. *Id.* at 849. However, in 1947, the tax was applied to out-of-state bottlers and manufacturers, and in 1957, the statute was revised to provide that in-state importers were required to remit the tax only "when the [out-of-state] bottler or manufacturer . . . had not paid the tax[.]" *Id.* In addressing in-state distributor Kroger's liability, the Court stated that "[d]omestic bottlers and manufacturers, of course, pay a tax measured by a percentage of their gross receipts from the sale of the products." *Kroger*, 608 S.W.2d at 848. However, the court explained that "[t]he statute imposed the tax on Kroger instead of the manufacturer [because the manufacturer] was beyond Tennessee's reach and had not [voluntarily] paid the tax." *Beaman*, 1996 WL 417100, at *3 (citing *Kroger*, 608 S.W.2d at 848). It further stated:

---

[8]Specifically, the Court examined Tennessee Code Annotated section 67-4102(b), the precursor to Tennessee Code Annotated section 67-4-402(b). *Kroger*, 608 S.W.2d at 848.

It seems apparent to us that the General Assembly intended to exact from [in-state] importers or dealers the same tax which would have been paid by out-of-state bottlers or manufacturers if those businesses had been subject to the state's taxing power. If they voluntarily paid the tax, then the dealer or distributor was not liable therefor, but in the event they did not pay the tax, the tax was imposed upon the dealer or distributor selling the products within the state.

*Kroger*, 608 S.W.2d at 848.

In *Beaman Bottling Co. v. Huddleston*, No. 01-A-01-9512-CH00567, 1996 WL 417100, at *3 (Tenn. Ct. App. July 26, 1996), this Court found that in-state soft drink manufacturer and distributor Beaman could not deduct its distribution costs from its gross receipts prior to calculating its tax obligation. *Id.* at *5. The court stated, "The record is clear that Beaman has engaged in the privilege of manufacturing and selling bottled soft drinks within the State of Tennessee. Therefore, Beaman is subject to the privilege tax." *Id.* at *2.

Again, neither *Kroger* nor *Beaman* addressed whether an in-state manufacturer and in-state distributor could select which entity would pay the bottler's tax. However, these cases seem to demonstrate that the legislature intended to first tax manufacturers; however, if a manufacturer is beyond the state's reach and does not voluntarily pay the tax, the in-state importer or distributor must pay the tax, as calculated based upon the manufacturer's gross receipts. Although the legislature expressly exempted in-state importers from bottler's tax liability when an out-of-state manufacturer pays such, no comparable provision has been enacted with regard to in-state manufacturers. We reject Dr. Pepper's contention that the legislature's failure to address the tax liability of an in-state distributor who purchases from an in-state manufacturer results in an ambiguity which must be resolved in Dr. Pepper's favor. Instead, we find that no express exemption of an in-state distributor who purchases from an in-state manufacturer is necessary, as the in-state manufacturer will necessarily be liable for the tax. We must presume that the legislature, had it wished to do so, would have included a similar allocation provision between in-state manufacturers and in-state distributors. *See State v. Edmondson*, 231 S.W.3d 925, 927 (Tenn. 2007) ("'[W]here the legislature includes particular language in one section of the statute but omits it in another section of the same act, it is presumed that the legislature acted purposefully in including or excluding that particular subject.'") (quoting *Bryant v. Genco Stamping & Mfg. Co.*, 33 S.W.3d 761, 765 (Tenn. 2000)).

We cannot agree that the statutory language permits the interpretation Dr. Pepper advocates–that an in-state manufacturer and an in-state distributor may choose which entity will pay the bottler's tax. A finding that the legislature did not intend to favor foreign commerce does not change this conclusion. Such a finding does not require us to so broadly interpret the statute to read in an allocation authorization which could have been, but was not, expressly included. In sum, we find that the statute "read as a whole" does not permit an in-state distributor, such as Burks, to pay the bottler's tax when it imports from an in-state manufacturer, such as Dr. Pepper.

### B. Definition of "Producer"

Tennessee Code Annotated section 67-4-402 imposes the bottler's tax against persons "manufacturing or producing and selling" bottled soft drinks within the state. **Tenn. Code Ann. § 67-4-402(b)**. The statute does not, however, define the term "producer." According to Dr. Pepper, being a "producer" means either: "(1) acting as a distributor; or (2) being such an important customer of a manufacturer that the manufacturer would not otherwise exist without its demand." Accordingly, Dr. Pepper maintains that Burks is a "producer" and therefore that "the bottlers tax could apply to Burks Beverage which could measure its tax based upon its cost of bottled soft drinks . . . and Dr. Pepper and Burks Beverage could choose who would pay the tax."

In interpreting statutes, we must "give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its scope." *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995) (citing *State v. Sliger*, 846 S.W.2d 262, 263 (Tenn. 1993)). "'The legislative intent and purpose are to be ascertained primarily from the natural and ordinary meaning of the statutory language, without a forced or subtle interpretation that would limit or extend the statue's application.'" *Mooney v. Sneed*, 30 S.W.3d 304, 306-07 (Tenn. 2000) (quoting *State v. Blackstock*, 19 S.W.3d 200, 210 (Tenn. 2000)); *see also Gleaves v. Checker Cab Transit Corp., Inc.*, 15 S.W.3d 799, 803 (Tenn. 2000) ("[C]ourt must 'presume that the legislature says in a statute what it means and means in a statute what it says there.'") (quoting *Bellsouth Telecomm., Inc.*, 972 S.W.2d 663, 673 (Tenn. Ct. App. 1997)).

In support of its argument, Dr. Pepper looks to the term as defined in other statutory contexts. For example, it points out that a petroleum "producer" includes persons who import or wholesale petroleum, Tenn. Code Ann. § 47-25-602, and that a natural resources "producer" includes persons engaged in "the production *and/or sale* of natural resources products[.]" Tenn. Code Ann. § 47-26-802. (emphasis added). Dr. Pepper also cites multiple

dictionary entries for the term "produce," which allegedly include "to provide, furnish, or supply," "to cause to occur or exist[,]" and "a person, company, or country to makes, grows, or supplies good or commodities for sale." Based upon these definitions, Dr. Pepper maintains that "the term 'producer' is broad enough and commonly used enough to include a distributor, especially a distributor who is the raison d'etre of a manufacturer." Alternatively, it argues that the term is ambiguous, and therefore, that the statute must be construed in its favor.

The trial court found that "manufacturing" and "producing," as used in the bottler's tax statute, have similar, but not identical, meanings. "In seeking to determine the 'natural and ordinary meaning' of statutory language, the usual and accepted source for such information is a dictionary." *English Mtn. Spring Water Co. v. Chumley*, 196 S.W.3d 144, 148 (Tenn. Ct. App. 2005) (citing *State v. Givens*, No. 01C01-9307-CR-00203, 1994 WL 406187, at *3 (Tenn. Crim. App. Aug. 4, 1994)). Black's Law Dictionary defines "produce" as "To give being or form to; to manufacture; to make." Additionally, other definitions cited by Dr. Pepper include "to bring forth," "to cause to occur or exist," to "cause or bring about," and to "cause to happen or come into existence[.]"

Because we must presume that the legislature "used each word purposely and that those words convey some intent and have a meaning and a purpose," *Auto Credit of Nashville v. Wimmer*, 231 S.W.3d 896, 900 (Tenn. 2007) (citing *Eastman Chem. Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn. 2004); *Tennessee Growers, Inc. v. King*, 682 S.W.2d 203, 205 (Tenn. 1984)), we agree with the trial court's conclusion that the terms "manufacturing" and "producing," as used in the bottler's tax statute, do not have identical meanings. Even so, we are not convinced that the term "producing" can be expanded to reference an entity which creates a demand for the manufacturing of bottled soft drinks or which purchases and distributes such drinks. We reject the idea that the existence of competing interpretations requires us to accept the taxpayer's proffered definition. Applying this conclusion to the instant case, we find that Burks is not a "producer" within the meaning of the bottler's tax.

### C. Equal Protection Clause

As we stated above, the parties do not dispute that the bottler's tax statute permits an allocation of the tax burden between an *out-of-state* manufacturer and an in-state importer. Having found that such allocation is not available between an *in-state* manufacturer and an in-state importer, and that an in-state importer cannot itself pay the tax as a "producer," we

must address Dr. Pepper's contention that this lack of flexibility violates the Equal Protection Clauses of both the United States and Tennessee Constitutions.

The Equal Protection Clause of the United States Constitution provides that "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Likewise, article I, section 8 and article XI, section 8 of the Tennessee Constitution "guarantee equal privileges and immunities for all those similarly situated." *Tenn. Small Sch. Sys. v. McWherther*, 851 S.W.2d 139, 152 (Tenn. 1993). Because our Supreme Court has "consistently held that the state equal protection guarantee is co-extensive with the equal protection provisions of the . . . U.S. Constitution[,]" *Calaway ex rel. Calaway v. Schucker*, 193 S.W.3d 509, 518 (Tenn. 2005) (citing *Tenn. Small Sch. Sys.*, 851 S.W.2d at 152), we will consider together Dr. Pepper's arguments regarding both alleged violations.

Our Supreme Court has adopted an analytical framework for analyzing equal protection challenges pursuant to the Tennessee Constitution similar to that used by the United State Supreme Court. *Gallaher v. Elam*, 104 S.W.3d 455, 460 (Tenn. 2003) (citing *State v. Robinson*, 29 S.W.3d 476, 481 (Tenn. 2000)). "Under this framework, one of three standards of scrutiny applies, depending upon the nature of the right asserted or the class of persons affected: (1) strict scrutiny; (2) heightened scrutiny; or (3) reduced scrutiny, applying the rational basis test." *Id.* (citing *Robinson*, 29 S.W.3d at 481). Because this case does not involve a suspect class, a quasi-suspect class, or a fundamental right, we must use the rational basis test to analyze Dr. Pepper's equal protection claim. *See id.* at 461. "'[T]he burden of showing that a classification is unreasonable and arbitrary is placed upon the individual challenging the statute; and if any state of facts can reasonably be conceived to justify the classification or if the unreasonableness of the class is fairly debatable, the statute must be upheld.'" *Beaman*, 1996 WL 417100, at *4 (quoting *Harrison v. Schrader*, 569 S.W.2d 822, 826 (Tenn. 1978)). Accordingly, "any plaintiff seeking to challenge the constitutionality of a tax statute bears a heavy burden." *Admiralty Suites and Inns, LLC v. Shelby County*, 138 S.W.3d 233, 240 (Tenn. Ct. App. 2003) (quoting *Nolichuckey Sand Co., Inc. v. Huddleston*, 896 S.W.2d 782, 788 (Tenn. Ct. App. 1994)).

"It is well settled that the equal protection clause does not require absolute equality from the State and its political subdivisions." *Posey v. City of Memphis*, 165 S.W.3d 575, 578-79 (Tenn. Ct. App. 2004) (citing *Gray's Disposal Co. v. Metro. Gov't of Nashville*, 122 S.W.3d 148, 162-63 (Tenn. Ct. App. 2002)). Equality between differently situated classes is not guaranteed, as the equal protection clause requires only "'that persons similarly situated be treated alike.'" *Id.* at 579 (quoting *Gallaher*, 104 S.W.3d at 461). Thus, as a

threshold determination, a court must first consider whether classes are "similarly situated so as to warrant application of the protection of the equal protection clause." *Id.* If similarly situated, but differentially treated, the court must then determine whether a rational basis exists for such differential treatment. *Id; see also Phelps v. Tenn. Dept. of Corr.*, No. M1999-02109-COA-R3-CV, 2000 WL 1038115, at *2 (Tenn. Ct. App. July 28, 2000) ("While the equal protection clause states that all persons similarly situated must be treated alike, the legislature may treat a class of persons differently so long as the classification has a rational relationship to a legitimate state interest."). Again, under a rational basis analysis, "'[i]f any possible reason can be conceived to justify the classification, or if the reasonableness be fairly debatable,' then the legislation will not be struck down." ***Admiralty Suites and Inns, LLC v. Shelby County***, 138 S.W.3d 233, 240 (Tenn. Ct. App. 2003) (noting that the constitutionality of a tax statute is analyzed using the rational basis standard) (quoting *Estrin v. Moss*, 430 S.W.2d 345, 349 (Tenn. 1968)).

The parties apparently agree that in-state and out-of-state bottled soft drink manufacturers are "similarly situated." However, Dr. Pepper seems to suggest that because the two types of manufacturers are similarly situated, differential treatment is necessarily impermissible. According to Dr. Pepper, "[w]hen a law is challenged under the rational basis standard, the law is constitutionally valid if the government had a reasonable basis for determining that the classes were not similarly situated." Dr. Pepper misinterprets the rational basis test's application. Because the equal protection clause protects only similarly situated persons, its rational basis test, consequently, tests whether a rational basis exists for the differential treatment of *similarly situated* persons.

The Department contends that the bottler's tax does not treat similarly situated persons differently. The Department correctly points out that the bottler's tax imposes a 1.9% tax rate on all persons who manufacture or produce and sell bottled soft drinks within Tennessee; on all persons who import and sell bottled soft drinks within Tennessee; and on all persons who cause to be imported and who sell bottled soft drinks within Tennessee. **Tenn. Code Ann. § 67-4-402(b)**. Similarly, the statute equally alleviates the tax burden of all out-of-state manufacturers or producers who do not directly distribute or sell within the state. *Id.*

Furthermore, the Department claims that any differential treatment of in-state manufacturers as compared to out-of-state manufacturers is rationally related to a legitimate state interest. Specifically, the Department argues that the statute is designed to avoid double taxation. Because the statute requires both an in-state importer and an out-of-state distributor who directly distributes and sells within the state to pay the tax, the Department claims that both entities would be required to pay the bottler's tax on the same bottled soft drink sales

but for the exception provided in subsection (b)(3).

In response, Dr. Pepper argues that the tax allocation between an out-of-state manufacturer and an in-state importer is unnecessary to avoid double taxation. Instead, Dr. Pepper maintains that double taxation could be avoided by simply imposing the bottler's tax upon the in-state importer. As an alternative means to afford equal protection, it claims, "the non-discriminatory solution is to . . . simply give all persons the same flexibility." Dr. Peppers states that "[i]f a legitimate state purpose can be served by a discriminatory solution and a non-discriminatory solution, then nothing is served by choosing the discriminatory solution; it is per se arbitrary and unconstitutional for the state to choose the discriminatory solution." Dr. Pepper provides no authority for this statement and we have found none. Instead, as we stated above, the appropriate test for determining whether differential treatment is permissible is the rational basis test. *See Beaman*, 1996 WL 417100, at *4 (citations omitted). The standard is not, as Dr. Pepper suggests, a "least restrictive means" test.

We find that the statute's flexibility with regard to out-of-state and in-state manufacturers has "some relevance" to its objective of avoiding double taxation. *See Beaman*, 1996 WL 417100, at *4 ("'[T]he Equal Protection Clause does not require absolute equality or precisely equal advantages.' The constitution requires only that there be 'some relevance to the purpose for which the classification is made.'") (citations omitted). Accordingly, we find that to the extent the bottler's tax imposes differential treatment of out-of-state and in-state manufacturers, it does not violate the Equal Protection Clauses of the United State or Tennessee Constitutions.

### D. Whether Dr. Pepper may Utilize Burks' F&E Credit

The bottler's tax provides that "[a]ny taxes paid pursuant to the [franchise and excise tax] provisions . . . *on the business* taxed by this section shall be a credit against the [bottler's] tax imposed by this section. The credit taken *on any return* shall not, however exceed seventy-eight and ninety-five hundredths percent (78.95%) of the tax liability shown *on any tax return*." **Tenn. Code Ann. § 67-4-402(d)** (emphasis added). Dr. Pepper states that "[t]his language does not literally require that the payor of the bottlers tax use its own [F&E] Credit[,]" and it essentially argues that a bottler's tax payor may utilize the F&E credit of any entity in the same business. Dr. Pepper suggests that if the legislature had wished to restrict a bottler's tax payor to using its own F&E credit, it would have referred to the "taxpayer" taxed rather than to the "business taxed" and it would not have alluded to the

credit appearing on "any" tax return.

Again, in construing this statute, we must "give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its scope." *Owens*, 908 S.W.2d at 926 (citing *Sliger*, 846 S.W.2d at 263). Additionally, we must presume that the legislature "used each word purposely and that those words convey some intent and have a meaning and a purpose," *Auto Credit of Nashville*, 231 S.W.3d at 900 (citing *Eastman Chem. Co.*, 151 S.W.3d at 507; *Tennessee Growers, Inc.*, 682 S.W.2d at 205).

Bearing the above principles in mind, we simply cannot agree that the statute allows the credit-trading scheme that Dr. Pepper advances. Instead, we agree with the Department's interpretation that the plain and ordinary meaning of the statute is that the "business taxed" is the entity whose activities subject it to the taxes referenced. We likewise agree that the statutory reference to "any tax return" does not imply an ability to utilize another entity's F&E credit, but instead it simply acknowledges that all bottler's tax payors are entitled to the credit, notwithstanding the type of return being made. This issue is without merit.

## V.  CONCLUSION

For the aforementioned reasons, we affirm the decision of the chancery court. Costs of this appeal are taxed to Appellant, Dr. Pepper Pepsi-Cola Bottling Company of Dyersburg, LLC, and its surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.

-13-